## Case No. 15,790.

UNITED STATES v. MITCHELL et al.[1]

[1 Hughes, 439.] [2]

Circuit Court, D. South Carolina. Nov. Term, 1871.

CONSPIRACY—ACTS DONE IN FURTHERANCE OF ILLEGAL PURPOSE—KU KLUX.

1. Upon an indictment of conspiracy, if the jury find that a conspiracy existed, and that the accused was a party to it, it is sufficient to warrant a conviction that the object of the conspiracy was to effect one of the purposes alleged in the indictment.

2. Each member of an unlawful conspiracy is a conspirator and is responsible, personally, for every act of the conspiracy, and for the acts of each member thereof, done by common consent in furtherance of its illegal purposes, and also for such acts done in furtherance of the conspiracy not consented to beforehand, if assented to subsequently to their perpetration; whether the party charged was actually present or not when such act was done.

3. It makes no difference in guilt, if the motive of a party joining a conspiracy was not illegal when he did join it, if he was afterwards aware of its illegality and still remained a member.

This was an indictment of conspiracy [against Robert Hayes Mitchell and others] in violation of section 6 of the act of congress, approved May 31st, 1870 [16 Stat. 140], entitled "An act to enforce the right of citizens to vote," etc. The indictment contained two counts, one for conspiracy to violate section first of the said act, and the other with intent to oppress, threaten, and intimidate one James Williams, a male citizen of the United States, of African descent, because he had exercised the right of voting on the third Wednesday in October, 1870. Robert Hayes Mitchell was first called up and his case was tried separately. [See Case No. 14,893.] In the trial of this case it was given in evidence by the prosecution that there existed in several of the northwestern counties of South Carolina, a powerful, secret, oath-bound organization, known as the "Ku Klux Klan," whose object was the defeat of the Republican party; and that the means used to accomplish this result were the killing of white Republicans and the whipping and intimidation of negroes, to keep them from voting.

The "obligation," "constitution," and "by-

laws" of the organization were proved by members of the Klan, and were as follows:

### "Obligation.

"I (name) before the immaculate Judge of heaven and earth, and upon the Holy Evangelists of Almighty God, do, of my own free will and accord, subscribe to the following sacredly binding obligation:

"1. We are on the side of justice, humanity, and constitutional liberty, as bequeathed to us in its purity by our forefathers.

"2. We oppose and reject the principles of the radical party.

"3. We pledge mutual aid to each other in sickness, distress, and pecuniary embarrassment.

"4. Female friends, widows, and their households shall ever be special objects of our regard and protection.

"Any member divulging, or causing to be divulged, any of the foregoing obligation, shall meet the fearful penalty and traitor's doom, which is Death! Death! Death!"

### "Constitution.

"Article 1. This organization shall be known as the ——— Order, No. ——— of the Ku Klux Klan, of the State of South Carolina.

"Article 2. The officers shall consist of a cyclops and scribe, both of whom shall be elected by a majority vote of the order, and to hold their office during good behavior.

"Article 3. It shall be the duty of the cyclops to preside in the order, enforce a due observance of the constitution and by-laws, and an exact compliance to the rules and usages of the order; to see that all members perform their respective duties; appoint all committees before the order; inspect the arms and dress of each member on special occasions; to call meetings when necessary; draw upon members for all sums needed to carry on the order.

"Sec. 2. The scribe shall keep a record of the proceedings of the order, write communications, notify other Klans when their assistance is needed, give notice when any member has to suffer the penalty for violating his oath, see that all books, papers, or other property belonging to his office, are placed beyond the reach of any but members of the order. He shall perform such other duties as may be required of him by the cyclops.

"Article 4. Section 1. No person shall be initiated into this order under eighteen years of age.

"Sec. 2. No person of color shall be admitted into this order.

"Sec. 3. No person shall be admitted into this order who does not sustain a good moral character, or who is in any way incapacitated to discharge the duties of a Ku Klux.

"Sec. 4. The name of a person offered for membership must be proposed by the committee appointed by the chief, verbally stating age, residence, and occupation; state if he was a soldier in the late war; his rank;

[1] A full report of the proceedings in this and similar cases of conspiracy tried at the same term, may be found in the "Ku Klux Conspiracy" (being the report, with accompanying testimony, made by the joint special committee of congress, to inquire into the condition of affairs in the late insurrectionary states, printed in 1872), vol. 5, pages 1615 to 1990. The present report is furnished for this volume by William Stone, Esq., late the United States attorney for South Carolina.

[2] [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission.]

whether he was in the Federal or Confederate service, and his command.

"Article 5. Section 1. Any member who shall offend against these articles, or the by-laws, shall be subject to be fined and reprimanded by the cyclops, as two-thirds of the members present at any regular meeting may determine.

"Sec. 2. Every member shall be entitled to a fair trial for any offence involving reprimand or criminal puishment.

"Article 6. Section 1. Any member who shall divulge any of the matters of the order shall suffer death.

"Article 7. Section 1. The following shall be the rules of order. Any matter herein not provided for shall be managed in strict accordance with the Ku Klux rules.

"Sec. 2. When the chief takes his position on the right, the scribe with the members forming a half-circle around them, and, at the sound of the signal instrument there shall be profound silence.

"Sec. 3. Before proceeding to business, the scribe shall call the roll and note the absentees.

"Sec. 4. Business shall be taken up in the following order:

"1. Reading the minutes.

"2. Excuse of members at preceding meeting.

"3. Report of committee of candidates for membership.

"4. Collection of dues.

"5. Are any of the order sick or suffering?

"6. Report of committees.

"7. New business."

"By-Laws.

"Article 1. Section 1. This order shall meet at ———.

"Sec. 2. Five (5) members shall constitute a quorum, provided the cyclops or scribe be present.

"Sec. 3. The cyclops shall have power to appoint such members of the order to attend to the sick, the needy, and those distressed, and those suffering from radical misrule, as the case may require.

"Sec. 4. No person shall be appointed on a committee unless the person is present at the time of appointment. Members of committees neglecting to report shall be fined thirty cents.

"Article 2. Section 1. Every member on being admitted shall sign the constitution and by-laws, and pay the initiation fee.

"Sec. 2. A brother of the Klan, wishing to become a member of this order, shall present his application, with the proper papers of transfer from the order of which he was a member formerly, shall be admitted to the order only by a unanimous vote of the members present.

"Article 3. Section 1. The initiation fee shall be ———.

"Article 4. Section 1. Every member who shall refuse or neglect to pay his fines or dues shall be dealt with as the chief thinks proper.

"Sec. 3. Sickness. or absence from the country, or being engaged in any important business, shall be valid excuses for any neglect of duty.

"Article 5. Section 1. Each member shall provide himself with a pistol, Ku Klux gown, and signal instrument.

"Sec. 2. When charges have been preferred against a member in a proper manner, or any matters of grievance between brother Klux are brought before the order, they shall be referred to a special committee of three or more members, who shall examine the parties, and determine the matters in question, reporting their decision to the order. If the parties interested desire, two-thirds of the members present voting in favor of the report, it shall be carried.

"Article 6. Section 1. It is the duty of every member who has evidence that another has violated article 2 to prefer the charge and specify the offence to the order.

"Sec. 2. The charge for violating article 2 shall be referred to a committee of five or more members, who shall, as soon as practicable, summon the parties and investigate the matter.

"Sec. 3. If the committee agree that the charges are sustained, that the member on trial has intentionally violated his oath or article 2, they shall report the fact to the order.

"Sec. 4. If the committee agree that the charges are not sustained, that the member is not guilty of violating his oath or article 2, they shall report to that effect to the order, and the charges shall be dismissed.

"Sec. 5. When the committee report that the charges are sustained, and the unanimous vote of the members is given in favor thereof, the offending person shall be sentenced to death by the chief.

"Sec. 6. The prisoner, through the cyclops of the order of which he is a member, can make application for pardon to the great grand cyclops of Nashville, Tennessee, in which case execution of the sentence can be stayed until pardoning power is heard from."

During the progress of the trial it was given in evidence that this organization deliberately planned the murder of one James Williams, a colored Republican, who had been a captain in a militia company in York county; that pursuant to the orders of one J. W. Avery, the chief of the order in York county, between forty and sixty members of the Klan met at night in an old muster-field, mounted, armed, and disguised, and proceeded to the house of said Williams, broke into it, took him to the woods near by, and there hung him until he was dead; a card being left upon him, which was found the following morning, bearing the words, "Jim Williams on his big muster." On the same night the same party visited divers other houses of colored people, took them out, threatened them, robbed them of their arms, and in-

formed them that if they voted again they should be killed. The defendant was among those who participated in this "raid." Amzi Rainey, colored, testified that the Ku Klux came to his house one Saturday night about ten o'clock, broke it open by force, and beat his wife. Rainey had gone into the loft of his house when he found the Ku Klux were there, but search was made for him, and he was found and brought down. After a series of cruelties, Rainey was forced to swear that he would never vote another radical ticket.

Dick Wilson, colored, in the course of his examination said that the Ku Klux visited his house on the 11th of April, about two or three o'clock in the morning. The door was forced open, and the men outside began firing into the house. Afterwards witness was compelled to go with them to the house of his son, who lived near him, where an unsuccessful search was made for him. When they could not find his son, they came out of the house, and asked witness where he was. He said, "Gentleman, I don't know." The reply was. "Don't you call me any gentleman; we are just from hell-fire; we haven't been in this country since Manassas," etc. After more talk, some one said to him, "We'll make a Democrat of you to-night." They made this man lie down, and whipped him with ramrods until he promised to publish a card stating that he was done with the Republican party, and with Scott and his ring.

During his argument before the jury, Mr. Johnson, one of the counsel for the defendant, made use of the following language, with reference to the facts proved at the trial: "But Mr. Attorney-General (Mr. Chamberlain) has remarked, and would have you suppose, that my friend and myself are here to defend, justify, or palliate the outrages that may have been perpetrated in your state by this association of Ku Klux. He makes a great mistake as to both of us. I have listened with unmixed horror to some of the testimony which has been brought before you. The outrages proved are shocking to humanity. They admit of neither excuse nor justification. They violate every obligation which law and nature imposes upon men. They show that the parties engaged were brutes, insensible to the obligations of humanity and religion. The day will come, however, if it has not already arrived, when they will deeply lament it. Even if justice shall not overtake them, there is one tribunal from which there is no escape. It is their own judgment, that tribunal which sets in the breast of every living man—that still small voice that thrills through the heart, the soul of the mind, and as it speaks, gives happiness or torture—the voice of conscience, the voice of God. If it has not already spoken to them, in tones which have startled them to the enormity of their conduct. I trust, in the mercy of heaven, that that voice will speak before they shall be called above to account for the transactions of this world; that it will so speak as to make them penitent, and that trusting in the dispensations of heaven, whose justice is dispensed with mercy, when they shall be brought before the bar of their great tribunal, so to speak, that incomprehensible tribunal, there will be found, in the fact of their penitence or in their previous lives, some grounds upon which God may say Pardon!"

D. T. Corbin, U. S. Atty., and D. H. Chamberlain, for the United States.

Reverdy Johnson and Henry Stanberry, for defence.

BOND, Circuit Judge (charging jury). You have listened with patience to the recital of the evidence in this cause, and without commenting upon that, the court proposes to state to you the law applicable to the evidence, which must guide you in making up your verdict. The indictment, gentlemen, is for a conspiracy, which is an agreement by two or more persons to do an unlawful thing, or to do a lawful thing by unlawful means. The thing to be punished is the unlawful conspiracy, and not the particular acts done in pursuance of it. The conspiracy is a crime, if nothing be done in pursuance of it. The indictment, gentlemen, contains two counts. The first charges the defendant and others, jointly indicted with him, with having conspired to violate the first section of the act of May 31st, 1870, by unlawfully hindering, preventing, and restraining a certain class of persons therein named from the future exercise of the right to vote at an election to take place in October, 1872, on account of their race, color, or previous condition of servitude. And the second count charges that he, with others, did conspire to injure, because of his color, James Williams, because he had exercised the right to vote previously. It is to these counts that you are to refer the evidence, and to apply the law which the court gives you. If you find, from the evidence, that there was no such conspiracy as described in the first count, or if there was a conspiracy, the object of which and its purpose were different from that set forth in the count, and that the object and purpose set forth in the count was not one of its purposes and objects, then the party charged is not guilty under the first count, though he may have been engaged in the conspiracy. But it is not necessary, if the jury find there was a conspiracy, and that the party was engaged in it, that they should find its purpose to have been single. If they find that one of its purposes was that set forth in the first count, to prevent citizens from the exercise of the right to vote because of their color, it is sufficient. An association having such a purpose is an unlawful conspiracy, and a party engaged in it may be punished under the first count.

Each member of such an association is a conspirator, and is responsible, personally, for every act of the conspiracy, and for the acts

of each member thereof, done by common consent, in furtherance of its illegal purposes, and also for such acts done in furtherance of the conspiracy not consented to beforehand, if assented to subsequently to their perpetration, and that whether the party charged was himself actually present or not when such act was done. And if the jury believe, from the evidence, that the various Klans spoken of by the witnesses, were but parts of one general conspiracy, this rule applies not only to the members of the same Klan, but to the acts and conduct of the members of the different Klans done in furtherance of the conspiracy. And it makes no difference in guilt if you find from the evidence that the motive of a party who joined the conspiracy was not illegal when he did join it, if you also find, that after he became a member, he was aware of the fact, or had reason to know, that the true object of tne conspiracy was to prevent or hinder the free exercise of the elective franchise by intimidation or violence, as aforesaid, on account of color, and that he still remained a member and participated in its meetings, and that, though you may also find he never himself actually used the force, intimidation; or violence, and was not present when it was used.

And now, if the jury find, from the evidence, that the party charged did so conspire to prevent the citizens described from exercising their right to vote on account of their color, at a future election, specified to be the election to take place on the third Wednesday of October, 1872, then the party charged is guilty under the first count of the indictment. And if the jury find, from the evidence, that they did so conspire, and for the same reason, to injure and oppress, on account of his color, one Jim Rainey, alias Jim Williams, because he had antecedently, on the third Wednesday of October, 1870, exercised his right to vote, then he is guilty on the second count.

But if the jury find, from the evidence, that no such conspiracy existed, or that if it existed, the intimidation or injury of voters because of their exercise of the suffrage, or to prevent its exercise, formed no part of its purpose, or that. if that were its purpose, the defendant was not engaged in it, then the defendant is not guilty. But the jury is not bound to believe the sole purpose of the conspiracy to be that set out in the first count; if they find it to be one of the purposes, it is sufficient. Nor if they find that the beatings and intimidation spoken of by the witnesses took place or existed, are the jury bound to believe that the reasons given at the time by the conspirators, if they find reasons were given, were the true reasons for such conduct, but the jury may determine, from all the evidence in the cause, what the true reasons were for such violence.

If the jury find, from the evidence, as we said before, that the conspiracy set forth in the first and second counts in the indictment existed, and the defendant engaged in it

there, he is guilty on both counts. If there existed no such conspiracy at the time set out in the indictment, or if existing, it had another object which did not include that set out in the indictment, or if existing, and having the illegal purpose, the defendant took no part in it, then he is not guilty. The jury are at liberty to find one of three verdicts. They may find the party guilty generally, or not guilty generally, or they may find him guilty on one count, and not guilty on the other.

The jury found a verdict of guilty on the second count. A motion was made for a new trial, but it was overruled, and the prisoner was subsequently sentenced to eighteen months' imprisonment and a fine of one hundred dollars.